[Crim. No. 22047. Sept. 8, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES RICHARD CARNEY, Defendant and Appellant.

COUNSEL

George Haverstick and Thomas F. Homann for Defendant and Appellant.

Quin Denvir, State Public Defender, Ralph H. Goldsen and George L. Schraer, Deputy State Public Defenders, as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Beatrice W. Kemp, Bruce Daniel Rosen, Michael D. Wellington, Louis R. Hanoian and Jesus Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—Defendant was charged with possession of marijuana for sale. (Health & Saf. Code, § 11359.) After unsuccessful motions to suppress evidence seized from his motor home, defendant pleaded nolo contendere and was granted probation. He appeals from that order.

The major issue presented is whether the warrantless search of defendant's motor home was justified by an exception to the warrant requirement.

The People seek to justify the search on two alternate theories: (1) the automobile exception and (2) the protective sweep exception.[1] We conclude that neither of these proposed justifications is applicable under the facts of this case and hence the order must be reversed.

## I

Agent Robert Williams of the Drug Enforcement Administration undertook a surveillance of suspected drug dealer Lee Bowman in the Horton Plaza area of downtown San Diego. Williams noticed defendant because "he did not look like he fit in the area there, and he was approaching a Mexican boy and talking to him." Defendant and the youth walked to a nearby parking lot, entered a Dodge motor home parked there and closed the curtains, including one across the front window.

Williams noted the license plate number of the motor home and recalled having received uncorroborated information from which he inferred that defendant "had taken the place of the person [i.e., Bowman] we were following and [that he was] dealing narcotics." The information was furnished by an organization called "WeTip" (We Turn in Pushers); it suggested that the motor home was associated with an individual who reportedly was exchanging marijuana for sex.

Additional officers, including an agent by the name of Clem, arrived in response to a request by Williams. The motor home was kept under surveillance during the entire hour and a half that defendant and the youth were inside. After the youth left the motor home the officers followed, stopped and questioned him. He told them the occupant of the motor home had given him marijuana in exchange for allowing the man to perform oral copulation on him.

The youth then complied with the officers' request that he return to the motor home, knock on the door, and ask defendant to come out. Defendant answered the door and as he stepped out of the motor home, the agents identified themselves as law enforcement officers. Agent Clem entered the motor home; inside he observed marijuana, ziploc bags, and a scale on a table. On the basis of Clem's observations, Williams arrested defendant, seized the motor home, and drove it to the police station. A subsequent search of the motor home revealed additional marijuana in the cupboards and refrigerator.

---

[1]The People have apparently abandoned their contention, raised below, that the motor home was validly searched as an "instrumentality of the crime." In any event, our decision in *People* v. *Minjares* (1979) 24 Cal.3d 410, 421-422 [153 Cal.Rptr. 224, 591 P.2d 514], explicitly rejected this argument.

At the preliminary hearing defendant moved to suppress the evidence seized from both searches of the motor home. The motion was denied by the magistrate on the ground that as to the initial search, Agent Clem had the right to enter to look for other persons; the more thorough second search was upheld as a standard inventory search. Defendant unsuccessfully renewed his suppression motion in the superior court, which found that (1) there was sufficient probable cause to arrest defendant; (2) the search of the motor home was authorized under the automobile exception; and (3) the motor home itself could be seized as an instrumentality of the crime.

## II

■ Article I, section 13, of the California Constitution establishes the right of the people of this state to be secure in their persons, houses, papers and effects against unreasonable searches and seizures. The Fourth Amendment provides a similar guarantee. This protection has repeatedly been interpreted to require the impartial approval of a judicial officer before undertaking most searches. (*Payton* v. *New York* (1980) 445 U.S. 573, 583-585 [63 L.Ed.2d 639, 648-650, 100 S.Ct. 1371]; *People* v. *Dalton* (1979) 24 Cal.3d 850, 855 [157 Cal.Rptr. 497, 598 P.2d 467].) "In the ordinary case . . . a search of private property must be both reasonable and pursuant to a properly issued search warrant." (*Arkansas* v. *Sanders* (1979) 442 U.S. 753, 758 [61 L.Ed.2d 235, 241, 99 S.Ct. 2586].)

■ The importance of the judicial warrant cannot be overemphasized: " 'The warrant requirement has been a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases in courts all over this county. It is not an inconvenience to be somehow "weighed" against the claims of police efficiency. It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the "well-intentioned but mistakenly overzealous executive officers" who are a part of any system of law enforcement' . . . . By requiring that conclusions concerning probable cause and the scope of a search 'be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime' [citation], we minimize the risk of unreasonable assertions of executive authority." (*Id.* at pp. 758-759 [61 L.Ed.2d at p. 241].) Thus, searches conducted without the benefit of the judicial warrant process are " '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 390 [57 L.Ed.2d 290, 298, 98 S.Ct. 2408], quoting *Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507]; accord, *People* v. *Minjares, supra,* 24 Cal.3d at p. 416.)

■ It is against this background that we examine defendant's challenge to the warrantless search of the living compartment of his motor home. If that search is to be upheld, it is the state's burden to show that it falls within one of the "few carefully circumscribed and jealously guarded exceptions" (*People* v. *Dalton, supra,* 24 Cal.3d at p. 855) to the warrant requirement. (*People* v. *Dumas* (1973) 9 Cal.3d 871, 881 [109 Cal.Rptr. 304, 512 P.2d 1208]; *Arkansas* v. *Sanders, supra,* 442 U.S. at p. 760 [61 L.Ed.2d at p. 242]; *McDonald* v. *United States* (1948) 335 U.S. 451, 456 [93 L.Ed. 153, 158-159, 69 S.Ct. 191].)

■ In the present case the state seeks to justify the search primarily under the so-called "automobile exception." Our formulation of the controlling principles of that doctrine provides that " 'officers are empowered . . . to search an automobile as "long as it can be demonstrated that (1) exigent circumstances rendered the obtaining of a warrant an impossible or impractical alternative, and (2) probable cause existed for the search." ' " (*Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557, 563 [128 Cal.Rptr. 641, 547 P.2d 417].)

The "automobile exception" had its genesis in *Carroll* v. *United States* (1925) 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790]; it has since been expanded and extensively litigated to the point that this area of search and seizure law is now characterized as "troubled" (*United States* v. *Ross* (1982) 456 U.S. 798, 817 [72 L.Ed.2d 572, 589, 102 S.Ct. 2157]) and "something less than a seamless web" (*Cady* v. *Dombrowski* (1973) 413 U.S. 433, 440 [37 L.Ed.2d 706, 714, 93 S.Ct. 2523]). The court in *Carroll* premised its analysis on the notion that there is a constitutional difference between houses and cars. The underlying rationale for this distinction was the inherent mobility of automobiles. (*Carroll, supra,* 267 U.S. at p. 153 [69 L.Ed. at p. 551]; *Cooper* v. *California* (1967) 386 U.S. 58, 59 [17 L.Ed.2d 730, 732, 87 S.Ct. 788]; see also Katz, *Automobile Searches and Diminished Expectations in the Warrant Clause* (1982) 19 Am.Crim.L.Rev. 557, 563-565 (hereafter referred to as Katz).) California courts have independently relied on similar reasoning. (*People* v. *Laursen* (1972) 8 Cal.3d 192, 201 [104 Cal.Rptr. 425, 501 P.2d 1145]; *People* v. *McKinnon* (1972) 7 Cal.3d 899, 907 [103 Cal.Rptr. 897, 500 P.2d 1097]; *People* v. *Odom* (1980) 108 Cal.App.3d 100, 107 [166 Cal.Rptr. 283].)

Although subsequent decisions have purported to rely on the mobility justification, the courts have recognized that this reasoning alone fails to support their sustaining of "warrantless searches of vehicles . . . in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent." (*Cady* v. *Dombrowski, supra,* 413 U.S. at pp. 441-442 [37 L.Ed.2d at p. 715]; accord, *United States* v.

*Chadwick* (1977) 433 U.S. 1, 12 [53 L.Ed.2d 538, 548-549, 97 S.Ct. 2476]; *South Dakota* v. *Opperman* (1976) 428 U.S. 364, 367 [49 L.Ed.2d 1000, 1004, 96 S.Ct. 3092].) This is demonstrated first by the line of cases in which warrantless searches were upheld regardless of the automobile's actual mobility, e.g., where there was no immediate danger that the vehicle would be removed from the jurisdiction. (See, e.g., *Cady, supra,* 413 U.S. 433 [car, disabled as result of accident, in control of police; driver, sole occupant, arrested and hospitalized]; *Chambers* v. *Maroney* (1970) 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975] [occupants of car arrested and car taken to police station]; *Cooper* v. *California* (1967) 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788] [defendant arrested and car impounded].) Conversely, another line of decisions disapproves certain warrantless searches of containers despite the recognition of their "mobility." (*Sanders, supra,* 442 U.S. 753 [suitcase in trunk of car]; *Chadwick, supra,* 433 U.S. 1 [footlocker in trunk of car]; *People* v. *Minjares, supra,* 24 Cal.3d at p. 418 [real, rather than theoretical, exigencies are required before luggage may be searched without a warrant]; see also *United States* v. *Ross, supra,* 456 U.S. at pp. 810-812, 822-824 [72 L.Ed.2d at pp. 584-586, 592-593] [containers in cars in which there is probable cause to believe contraband is being transported determined to be less protected than containers in other settings]; but see *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 461, fn. 18 [29 L.Ed.2d 564, 580, 91 S.Ct. 2022].)[2]

In the face of this apparent volatility, the courts have recognized that mobility is no longer the prime justification for the automobile exception; rather, "the answer lies in the diminished expectation of privacy which surrounds the automobile." (*Chadwick, supra,* 433 U.S. 1, 12 [53 L.Ed.2d 538, 549, 97 S.Ct. 2476]; *People* v. *Minjares, supra,* 24 Cal.3d at p. 418; see also *Katz, op. cit. supra,* 19 Am.Crim.L.Rev. at pp. 564-572; *State* v. *Bottelson* (1981) 102 Idaho 90 [625 P.2d 1093, 1096].)[3] A variety of factors

---

[2]For a thoughtful discussion of the development of the "automobile exception," see Note, *Warrantless Vehicle Searches and the Fourth Amendment: The Burger Court Attacks the Exclusionary Rule* (1982) 68 Cornell L.Rev. 105.

[3]This reasoning is not undermined by *United States* v. *Ross, supra,* the most recent Supreme Court decision to address the "automobile exception." In *Ross,* the court was called upon to resolve the conflict, which is involved in every case in which an automobile is stopped on a highway or public street, "between the individual's constitutionally protected interest in privacy and the public interest in effective law enforcement." (456 U.S. at p. 804 [72 L.Ed.2d at p. 580].) The court suggested that an "individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband." (*Id.* at p. 823 [72 L.Ed.2d at pp. 592-593].) Thus, it held that "if probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." (*Id.* at p. 825 [72 L.Ed.2d at p. 594].) This holding signals a retreat from the earlier "container" cases without overruling them entirely. As one commentator has paraphrased it, under the new rule "when police officers have probable cause to stop an automobile on the street and the object of their search is not some specifically identifiable con-

that reduce the expectation of privacy in automobiles have been identified by the courts. "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and *it seldom serves as one's residence or as the repository of personal effects*. . . . It travels public thoroughfares where both its occupants and its contents are in plain view." (Italics added.) (*Cardwell* v. *Lewis* (1974) 417 U.S. 583, 590 [41 L.Ed.2d 325, 335, 94 S.Ct. 2464].) In other words, "The expectation of privacy as to automobiles is . . . diminished by the obviously public nature of automobile travel." (*South Dakota* v. *Opperman, supra,* 428 U.S. at p. 368 [49 L.Ed.2d at p. 1005]; see also *Rakas* v. *Illinois* (1978) 439 U.S. 128, 154, fn. 2 [58 L.Ed.2d 387, 408, 99 S.Ct. 421] (conc. opn. by Powell, J.).) Moreover, "automobiles, unlike homes, are subject to pervasive and continuing governmental regulation and controls" which adds to the lessened expectation of privacy. (*South Dakota* v. *Opperman, supra,* 428 U.S. at p. 368 [49 L.Ed.2d at p. 1004]; accord, *United States* v. *Chadwick, supra,* 433 U.S. 1, 12-13 [53 L.Ed.2d 538, 549].)

 In the present case, we are called upon to apply this reasoning to a hybrid—a motor home—which has the mobility attribute of an automobile combined with most of the privacy characteristics of a house. Defendant maintains that the factors discussed above that dilute the expectation of privacy in automobiles do not so affect the privacy interests in a motor home. We agree.

First and foremost, unlike an automobile the primary function of a motor home is not transportation. Motor homes are generally designed and used as residences; their essential purpose is to provide the occupant with living quarters, whether on a temporary or a permanent basis. Both Vehicle Code section 396 and Health and Safety Code section 18008 refer to a mobile-home not as a vehicle but as a transportable "structure." The motor home at issue here was equipped with at least a bed, a refrigerator, a table, chairs, curtains and storage cabinets.[4] Thus the contents of the motor home created

---

tainer known to be inside, they may search the entire car and open any package or container the officers find inside whether they have a search warrant or not." (Note, *United States v. Ross: Search and Seizure Made Simple* (1983) 10 Pepperdine L.Rev. 421, 446.)

This expansion of the scope of automobile searches has no relevance to the issue raised by the case at hand if we determine that the justifications for the "automobile exception" are inapplicable to motor homes. The only aspect of *Ross* that relates to the present case, therefore, is the extent to which the court expresses a continued concern for expectations of privacy in the search and seizure area. As discussed above, although *Ross* holds there is a lowered expectation of privacy in automobiles and containers placed in automobiles, this does not signal a retreat from the general principles of expectations of privacy in other settings such as those presented by the case at bar.

[4]The record does not disclose what other fixtures, furnishings or appliances (i.e., stove, sink, etc.) were installed in this particular motor home. Amicus implies that it also had bathing and toilet facilities, but the record is silent on the point. Although a more complete record would have been helpful, its omission does not bar us from concluding that defendant's motor home is more akin to living quarters than to a mere mode of transportation.

a setting that could accommodate most private activities normally conducted in a fixed home. The configuration of the furnishings, together with the use of the motor home for all manner of strictly personal purposes, strongly suggests that the structure at issue is more properly treated as a residence than a mere automobile.

■ Homes are afforded the maximum protection from warrantless searches and seizures. (*People* v. *Ramey* (1976) 16 Cal.3d 263, 271, 273-276 [127 Cal.Rptr. 629, 545 P.2d 1333]; *People* v. *Dumas, supra,* 9 Cal.3d at p. 882, fn. 8.) The " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (*Payton* v. *New York, supra,* 445 U.S. at p. 585 [63 L.Ed.2d at p. 650].) ■ The fact that a motor home is not affixed to real property does not demean its protected status as a house.

"The concept that a man's home is his castle is an ancient one. It has had a profound effect upon our legal history. Its application to the innocent and the guilty, the rich and the poor is no figment of the imagination of modern-day judges." (*United States* v. *Nelson* (6th Cir. 1972) 459 F.2d 884, 885.) The classic exhortation of William Pitt, Earl of Chatham, bears repetition: " 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter, the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!' " (Quoted in *Miller* v. *United States* (1958) 357 U.S. 301, 307 [2 L.Ed.2d 1332, 1337, 78 S.Ct. 1190].) The principal function of the structure here was to provide living quarters rather than a means of transportation; furthermore, this function was reasonably apparent from the exterior of the motor home. For these reasons, it is entitled to a degree of protection similar to that accorded an Englishman's cottage or "ruined tenement."[5]

We recognize that motor homes are commonly used as temporary living quarters for vacations or other short-term visits away from one's primary residence. This factor, however, does not diminish the reasonable expectation of privacy. ■ "No less than a tenant of a house, or the occupant

---

[5]In *People* v. *Dumas, supra,* 9 Cal.3d at page 882, footnote 9, we cited *United States* v. *Miller* (10th Cir. 1972) 460 F.2d 582, as holding that a "mobile camper van" is to be accorded protection similar to that given an automobile. This reference, however, was merely part of a review of the law of other jurisdictions in various related fact situations; we did not intend thereby to express any approval of the holding in *Miller*. In any event, the *Miller* court did not undertake an expectation of privacy analysis, but instead upheld the search under the "totality of the facts and circumstances." (*Id.* at p. 586.) Furthermore, *Miller* was decided prior to *Chadwick, supra,* 433 U.S. 1, which significantly altered the federal constitutional analysis to be applied to automobile search cases. For these reasons, *Miller* is not persuasive authority on the question presented here.

of a room in a boarding house, [citation] a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." (*Stoner* v. *California* (1964) 376 U.S. 483, 490 [11 L.Ed.2d 856, 861, 84 S.Ct. 889]; accord, *People* v. *Escudero* (1979) 23 Cal.3d 800, 807 [153 Cal.Rptr. 825, 592 P.2d 312].) It is established beyond question that those who stay temporarily in hotels or motels while away from their permanent residences are protected from intrusions into the privacy of such temporary living quarters (*ibid.*); no pervasive reason has been suggested why persons who rely on motor homes for such shelter should be penalized by depriving them of similar protections.

In this same vein, although an automobile may seldom be used as a repository of intimate effects, the same characteristic is not true of a motor home. To the extent an individual uses a motor home as his permanent or temporary residence, it, as much as a house, serves as his "place of refuge" in which he should be "free from unreasonable governmental intrusion." (*Silverman* v. *United States* (1961) 365 U.S. 505, 511 [5 L.Ed.2d 734, 739, 81 S.Ct. 679].) In this sense, a motor home often serves as a repository for personal effects to the same degree as a home, an office, or certainly a piece of luggage.

Finally, unlike a car, the interior and contents of an ordinary motor home are not generally exposed to the public, nor are the occupants, the furnishings or any personal effects in plain view. The decisions of the Supreme Court " 'have time and again underscored the essential purpose of the Fourth Amendment to shield the citizen from unwarranted intrusions into his privacy.' [Citations.] . . . [¶] [I]t is [therefore] the right to privacy that is the touchstone of our inquiry." (*Cardwell* v. *Lewis, supra,* 417 U.S. at pp. 589, 591 [41 L.Ed.2d at pp. 334, 335]; see also *Katz* v. *United States, supra,* 389 U.S. at pp. 351-352 [19 L.Ed.2d at pp. 581-582].) The interior of a motor home is often fully shielded from view by its design: the windows, if any, are generally so small or placed in such a manner that little or none of the interior can be seen by a person standing outside. Moreover, whatever view exists may be blocked by window coverings such as shades, curtains, or blinds. Regardless of its particular configuration, however, in the case of a motor home as with a fixed house the issue is whether the occupant manifests an objectively reasonable expectation of privacy in the interior. Defendant's expectation of privacy in the motor home here was clearly justifiable.

In a recent decision the Ninth Circuit has also held the "automobile exception" inapplicable to a motor home. (*United States* v. *Williams* (9th Cir. 1980) 630 F.2d 1322, 1326.) In *Williams,* border patrol agents detained an automobile that had been travelling with a Pace Arrow motor home; the

agent suspected the car might be transporting illegal aliens. The driver of the car directed the agent to the motor home to obtain a key for the car's trunk; occupants of the motor home denied any knowledge of the key or the car. The agents broke into the trunk of the car and discovered contraband and substances used in the manufacture of contraband. One agent, suspicious of the association between the car and the motor home, returned to the motor home, which had moved in the interim, and arrested its occupants. Five hours later, narcotics agents arrived and searched the motor home without a warrant.

The court held this search could not be justified under the "automobile exception" because of the greater expectation of privacy associated with a motor home: "The vehicle in question was not an ordinary automobile but a motor home. Whatever expectations of privacy those travelling in an ordinary car have, those travelling in a motor home have expectations that are significantly greater. People typically do not remain in an auto unless it is going somewhere. The same is not true of a motor home, in which people can actually live. In the ordinary motor home, the glass is tinted or shades can be drawn so that passers-by cannot peer in. Moreover, many, like the one in this case, have beds and fully equipped baths, making them in some senses more akin to a house than a car. In light of . . . these factors, we cannot uphold this search merely because it was a search of a motor home." (*Ibid.*)[6]

At the very core of the Fourth Amendment protection against warrantless searches stands the right of an individual to retreat into his own home and there be free from unreasonable government intrusion. An individual " 'can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without disobeying the Constitution. . . . A sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle.' " (*Silverman* v. *United States, supra,* 365 U.S. 505, 511-512, fn. 4 [5 L.Ed.2d 734, 739].) These principles hold true no less for the home resting on wheels than for the home resting on a cement foundation. In that the outward appearance of the motor home here would have alerted a reasonable person to believe it was likely to be serving as at least a temporary residence, it was entitled to the protections traditionally given to a home.[7]

---

[6]Ultimately the court upheld the search on the basis of exigent circumstances of danger arising from the special risks associated with the manufacture of a particular controlled substance under these conditions (i.e., the presence of volatile chemicals). (*Id.* at p. 1327.)

[7]Of course, even if the function of the structure or vehicle is not apparent from its exterior, the protections will come into play at whatever point a reasonable person would realize that the place being searched is serving as a home (e.g., from its furnishings or other residential accoutrements.)

Accordingly, we conclude that a motor home is fully protected by the Fourth Amendment and is not subject to the "automobile exception." Of course this does not preclude all warrantless searches of motor homes; it simply means that such searches cannot be justified by that particular exception to the warrant requirement.[8] We therefore proceed to inquire into the remaining justification for the search offered by the People.

### III

■ The People next assert that their initial search of the living quarters of defendant's motor home should be upheld as a "protective sweep" for other suspects who might endanger the law enforcement officers or destroy evidence. On the record before us this purported justification must fail.

■ Defendant contends the protective sweep theory is being raised for the first time on appeal and must therefore be disregarded. (See *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640 [108 Cal.Rptr. 585, 511 P.2d 33]; *People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186, 198-199 [101 Cal.Rptr. 837, 496 P.2d 1205].) He concedes the argument was made by the People at the preliminary hearing, but maintains that their failure to renew it in superior court bars them from asserting it on appeal. In the circumstances of this case, the point is not well taken. First, the record does not support defendant's version of the superior court hearing: at that hearing the district attorney, although not arguing the point, expressly stated that "we are not conceding the fact that the officer had no right to look for other suspects, because I think he had every right to protect himself by doing just that. The points and authorities just point out there are a number of different theories upon which the search . . . can be justified."

Second, the parties agreed to make the preliminary hearing transcript a part of the record in the superior court proceeding. "While it is preferable for the prosecution to set forth its justification for a warrantless search . . . in its responses to the defendant's motion to suppress evidence, the People's theory or justification can be determined from the evidence and argument offered." (*People* v. *Whyte* (1979) 90 Cal.App.3d 235, 242 [152 Cal.Rptr. 280]; see also *People* v. *Manning* (1973) 33 Cal.App.3d 586, 601 [109 Cal.Rptr. 531].) One rationale for the rule prohibiting the People from raising a new justification on appeal is that to allow them to do so would " 'deprive the defendant of a fair opportunity to present an adequate record

---

[8]We note in this respect that the People present no cognizable claim of "exigent circumstances" independent of the automobile exception itself. In that the incident occurred on a weekday afternoon while the motor home was parked within a few blocks of the courthouse, it would have been quite simple for the officers to seek a warrant from a magistrate and to have thereby avoided all their present difficulties.

in response.'"" (*People* v. *Superior Court (Simon)*, *supra*, 7 Cal.3d at p. 198; accord, *People* v. *Miller* (1972) 7 Cal.3d 219, 227 [101 Cal.Rptr. 860, 496 P.2d 1228].) The People here advanced the protective sweep theory at the preliminary hearing; in fact the magistrate apparently ruled in the People's favor on that ground. Defendant had the opportunity to, and did, attack the proposed justification at that time. The full record of the preliminary hearing reflecting these arguments and counterarguments was before the superior court when it ruled on the suppression motion. Under these circumstances, there is no bar preventing the People from now urging the point.

■ We turn therefore to the substance of the People's protective sweep justification. In *People* v. *Block* (1971) 6 Cal.3d 239 [103 Cal.Rptr. 281, 499 P.2d 961], we articulated the rule that under certain limited circumstances warrantless searches for additional suspects are permissible. In *Block,* police officers arrested defendant and a number of other people during a well-attended "pot party"; one officer then went upstairs in search of other possible suspects, and while there observed marijuana in plain view. We held that the facts known to the officer (i.e., presence of six or seven persons downstairs at a "pot party" involving an undetermined number of participants; lights on upstairs) supported a reasonable belief that additional culpable persons might be in the house; the officer's search was therefore reasonable.

We emphasized, however, that a determination of the reasonableness of the officer's actions was "dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate. [Citation.] And in determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or 'hunches,' but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary." (*Id.* at p. 244.)

In *Dillon* v. *Superior Court* (1972) 7 Cal.3d 305 [102 Cal.Rptr. 161, 397 P.2d 505], we applied *Block* and held that the circumstances presented did not justify a search for other suspects. There, police officers investigating reports of marijuana cultivation in a backyard accompanied the defendant to the suspected location behind the house and arrested her. The defendant then went inside the house to make a phone call, again accompanied by the officers. The officers, over the defendant's objection, searched the entire house and located contraband.

We held that the information known to the officers did not constitute "sufficient and articulable facts" to justify the search: "None of the officers testified that he was in fear of his life or safety. The detective in charge admitted that he had no specific articulable information that any suspects were in the house at that moment; only general information that two other persons had been living at the house." (*Id.* at p. 313.) We concluded that "the mere possibility of additional persons in the house, without more, is not enough to provide probable cause to search the entire premises for additional suspects. . . . [¶] [T]he mere fact that the marijuana plants were found in the backyard and that two others had been living at the house, without additional facts, does not furnish probable cause to believe that others may be present in the house." (*Id.* at p. 314.)

Federal law applies a similar standard and allows protective sweep searches only "when the officers reasonably believe that there might be other persons on the premises who could pose some danger to them." (*United States* v. *Gardner* (9th Cir. 1980) 627 F.2d 906, 909-910, and cases cited; accord, *United States* v. *Allen* (9th Cir. 1980) 675 F.2d 1373, 1382; *United States* v. *Bowdach* (5th Cir. 1977) 561 F.2d 1160, 1168-1169.) The underlying rationale for the protective sweep doctrine is, of course, the exigent circumstances exception to the warrant requirement: "When police officers, acting on probable cause and in good faith, reasonably believe from the totality of circumstances that (a) evidence or contraband will *imminently* be destroyed or (b) the nature of the crime or character of the suspect(s) pose a risk of danger to the arresting officers or third persons, exigent circumstances justify a warrantless entry, search or seizure of the premises." (Fns. omitted; italics added.) (*United States* v. *Kunkler* (9th Cir. 1982) 679 F.2d 187, 191-192; accord, *United States* v. *Gardner* (5th Cir. 1977) 553 F.2d 946, 948; *United States* v. *Guidry* (6th Cir. 1976) 534 F.2d 1220, 1222-1223; see also *People* v. *Ramey, supra,* 16 Cal.3d at p. 276.)

Applying the foregoing principles to the case at hand, we conclude that the facts presented did not justify the warrantless entry of the motor home.

As we have noted herein, the burden is on the People to establish that a warrantless search was justified under an exception to the warrant requirement. Thus, to the extent the People relied on the protective sweep theory, it was their burden to show that the officers were aware of specific, articulable facts from which they could reasonably infer other suspects were in the motor home.

In essence, the People contend that the WeTip letter sufficiently justified a reasonable belief that other suspects might be present. This letter pur-

portedly (1) linked the motor home to drug dealing activities, and (2) indicated that Lee Bowman was customarily using the motor home for such activities. We note first that the WeTip letter was based on uncorroborated anonymous information, not a justifiable basis, without more, for specific and articulable suspicions. Second, the reference to Bowman in the letter had no relevance to whether he was inside the motor home at the time defendant was arrested. In *Dillon,* we held that the mere possibility that others might be inside the house based on the fact more than one person lived there was insufficient to support a protective sweep search. In the present case there was even less support: the WeTip information was of marginal reliability, and even if relied on, it indicated only a possible association of Bowman to the motor home. Bowman's tenuous connection to the motor home provides little support for a reasonable belief that he lived there or that he was present at the time of defendant's arrest. Indeed, Agent Williams testified he believed defendant "had taken the place" of Bowman.

Moreover, the motor home had been under surveillance for over an hour and no one except defendant and the youth had entered or left. None of the officers testified that they had any reason to believe there were other suspects inside or that they did in fact subjectively believe this was the case. Furthermore, the record is silent as to whether the officers questioned the youth to discover if there were others inside, and if they did, what his response was. Had the officers been truly concerned for their safety, it would have been elementary for them to have asked the person who had just left the motor home how many people were inside.[9] Thus, the People failed to establish that the officers had a reasonable belief, grounded on specific articulable facts, that other persons were inside the motor home.[10] The People's attempt to justify the search on the basis of the protective sweep exception must, therefore, be rejected.[11]

---

[9]This is not to say, of course, that had the youth stated defendant was alone, the officers would have been required to trust his response. It appears likely, however, that if the officers believed the boy's admission that he received marijuana for sex, there would be little reason to disbelieve a far less incriminatory statement as to the number of occupants in the motor home. In any event, any response would simply have been another factor for the officers to consider in determining whether there was reasonable cause under the totality of the circumstances to believe others were inside the motor home.

[10]We also note that none of the officers even alluded in his testimony to a suspicion that evidence or contraband was in danger of imminent destruction. We conclude therefore that the People did not rely on potential destruction of evidence as part of their justification for the protective sweep search.

[11]Because of our conclusion in parts II and III, *ante,* that the initial warrantless search of the motor home was not justified by any exception to the warrant requirement, we need not reach the issue of the validity of the subsequent search. In any event, the burden, of course, would be on the People to justify this additional warrantless search. The only argument asserted by the People on this point, however, relies solely on the validity of the initial search of the motor home; i.e., the People contend that the marijuana and paraphernalia found as a result of the first search provided probable cause to believe additional contraband

In light of the foregoing, the order of probation is reversed and the case is remanded to the trial court to permit defendant to withdraw his plea and for further proceedings consistent with this opinion. (*People* v. *Miller* (1983) 33 Cal.3d 545, 556 [189 Cal.Rptr. 519, 658 P.2d 1320].)

Bird, C. J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**RICHARDSON, J.**—I respectfully dissent.

In my view, under the facts of the present case the officer's search of defendant's vehicle was valid by reason of the "automobile exception" to the warrant requirement. (See *People* v. *Chavers* (1983) 33 Cal.3d 462 [189 Cal.Rptr. 169, 658 P.2d 96].) The majority holds, however, that "a motor home . . . is not subject to the 'automobile exception.'" (*Ante,* p. 610.) Considering the necessity for careful guidance to law enforcement, I have several objections to that generalization.

First, the majority fails to define its terms. What precisely are "motor homes"? They are almost infinitely variable in size, shape, design, access, and visibility. Some of the smaller ones are the most enclosed. Others are separately attached as trailers, while still others have direct access from the driver's cab. Is a camper or recreational vehicle a "motor home"? What about a large van or truck? As we explained so recently in *Chavers,* "there is a demonstrable need for clear guidelines by which the police can gauge and regulate their conduct, rather than a complex set of rules dependent upon the particular facts . . . ." (33 Cal.3d at p. 469.) Although the majority uses the term as if it were readily understood, I find no definition either in statute or dictionary.

Moreover, the majority implies that any motorized vehicle which also serves as a "residence" would be afforded constitutional protection as a "motor home." Some people live in the cab of a truck. For others, "home" may be a sleeping bag thrown in the back of a pickup truck. The interior of many vehicles is obscured by tinted glass or shades or venetian blinds. Does this fact alone establish the vehicle as a "residence" for Fourth Amendment purposes? If it does not, how then are police officers to determine that a protectible "residential" use actually exists without first entering the vehicle? If a motor home is a residence, what is the address of the residence?

---

would be found inside the motor home. Our holding that the initial search was unreasonable leads inevitably to the conclusion that its fruits cannot be used to justify the subsequent search.

We are concerned, here, with matters of degree. I fully agree that definitions are difficult and that those who "reside" or "live" in a motorized vehicle have a heightened expectation of privacy, but broad generalizations are not useful. While protecting the citizens from unreasonable police intrusions, we also should recognize the difficulty facing law enforcement in balancing its obligation to protect the general public from criminal depredation.

In my view, if the facts reasonably indicate to the investigating officers that the vehicle is currently being used primarily as a residence rather than for transportation purposes, then the "automobile exception" would be inapplicable. Such residential use might be indicated by the attachment to exterior utility services, for example. On the other hand, if the facts reasonably disclose no such residential use, or if they indicate that such use is secondary or collateral to transportation purposes, then the exception should apply. The reason for the "exigency" exception, the full mobility of a motor vehicle, has equal application to "motor homes." With most motor homes, the "residence" can be three states away in a matter of hours.

In the present case, defendant's "motor home" was parked on a weekday afternoon in a downtown vehicular public parking lot near commercial enterprises, rather than in a neighborhood mobilehome park or other usual facility indicating current residential use. To me, a "motor home" parked in a public parking lot is more "vehicle" than "residence." Of course, it may be both and I readily acknowledge that we are working in gray areas. However, given the time of day and the location of defendant's vehicle, the officers reasonably could assume that it was then being used primarily, predominantly and principally for transportation uses. Accordingly, the search was valid.

I would affirm the judgment.

Respondent's petition for a rehearing was denied October 6, 1983. Richardson, J., was of the opinion that the petition should be granted.